# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, | ) ) | |
| | ) | Civil Action No. 1:25-CV-590 |
| Plaintiff, | ) ) | |
| v. | ) ) | Hon. Judge Neary |
| TALEN ENERGY CORPORATION AND BRUNNER ISLAND, LLC, | ) ) ) | Electronically Filed |
| Defendants. | ) ) | |

# DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR
# <u>MOTION TO DISMISS</u>

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

INTRODUCTION ........................................................................... 1

ARGUMENT ................................................................................ 2

I.    CBD Cannot Satisfy Threshold Standing Requirements. ............................. 2

      A.    CBD's Alleged Informational Injury Is Not a Cognizable
            Injury-in-Fact ........................................................... 3

      B.    CBD's Alleged Injuries Would Not Be Redressed by an Order
            Forcing Brunner to Comply with the 2015 CCR Rule Because
            Brunner's Ongoing Abatement and Monitoring Are at Least as
            Extensive as What the Rule Requires. ..................................... 5

II.   Brunner is Not in Violation of the 2015 CCR Rule. ............................... 10

      A.    AB5 is Not an Inactive Surface Impoundment Under the 2015
            Rule ..................................................................... 11

      B.    EPA's Prospective Regulation of AB5 as a CCR Management
            Unit Means that It Cannot Be an Inactive Surface
            Impoundment .............................................................. 16

III.  CBD's Arguments Against the Diligent Prosecution Bar and DEP's
      Primary Jurisdiction Require Second-Guessing DEP's Enforcement
      and Expertise. ................................................................. 17

CONCLUSION .............................................................................. 19

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arcos Sanchez v. Attorney General*,
    997 F.3d 113 (3d Cir. 2021) ............................................................................... 11

*Elec. Energy v. Env't Prot. Agency*,
    106 F.4th 31 (D.C. Cir. 2024) .............................................................................. 15

*Grp. Against Smog & Pollution, Inc. v. Shenago Inc.*,
    810 F.3d 116 (3d Cir. 2016) ................................................................................. 18

*Korvettes, Inc. v. Brous*,
    617 F.2d 1021 (3d Cir. 1980) ............................................................................... 15

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) ................................................................................................ 4

*Melton Props., LLC v. Ill. Cent. R.R. Co.*,
    539 F. Supp. 3d 593 (N.D. Miss. 2021) ............................................................... 18

*Pub. Int. Legal Found. v. Sec'y Commonwealth of Pa.*,
    136 F.4th 456 (3d Cir. 2025) .................................................................................. 4

*Raritan Baykeeper v. NL Indus., Inc.*,
    660 F.3d 686 (3d Cir. 2011) ................................................................................. 18

*Steel Co. v. Citizens for Better Env't*,
    523 U.S. 83 (1988) .................................................................................................. 3

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021) ................................................................................................ 4

*United States v. Sunoco, Inc.*,
    644 F. Supp. 2d 566 (E.D. Pa. 2009) ................................................................... 18

*Ysleta Del Sur Pueblo v. Texas*,
    596 U.S. 685 (2022) .............................................................................................. 15

iii

**Regulations**

40 C.F.R. § 257.53 ................................................................6, 11

40 C.F.R. § 257.91 ....................................................................8

40 C.F.R. § 257.94 .................................................................8, 9

40 C.F.R. § 257.95 .................................................................8, 9

40 C.F.R. § 257.96 ....................................................................9

40 C.F.R. § 257.97 ....................................................................9

40 C.F.R. § 257.104 ..................................................................9

80 Fed. Reg. 21302 (Apr. 17, 2015) ...............................12, 13, 14, 15, 19

89 Fed. Reg. 38950 (May 8, 2024) .....................................................16

**Other Authorities**

*Southcentral Community Information: Brunner Island*, Pa. Dep't of
    Env't Prot., https://www.pa.gov/agencies/dep/about-dep/regional-
    office-locations/southcentral-regional-office/southcentral-
    community-information/brunner-island.html .......................................3

## INTRODUCTION

The brief filed by Center for Biological Diversity ("CBD") in opposition to the Motion to Dismiss by Talen Energy Corporation and Brunner Island, LLC (collectively, "Brunner") confirms that CBD's theory of harm rests in large measure on an alleged informational injury that does not amount to a cognizable injury-in-fact. Likewise, CBD cannot meet the redressability requirement of standing because Brunner's monitoring and abatement activities under the 2019 Consent Decree ("CD") are at least as extensive as (and in many respects considerably more extensive than) what the 2015 Coal Combustion Residuals ("CCR") Rule requires. Dismissal for lack of subject matter jurisdiction is appropriate for these reasons alone.

On the merits, while CBD now disclaims any reliance on the 2024 CCR Rule, it is telling that CBD waited ten years to bring suit over Brunner's alleged violation of the 2015 CCR Rule based on a definition of "liquids" that was not promulgated until 2024. Indeed, the only way for CBD to maintain its case is by relying on this new definition, but as CBD seems to concede, doing so would violate Due Process and the rule against retroactivity. Moreover, EPA—the author of the rules and the ultimate authority for enforcement—has never characterized Brunner's Ash Basin 5 ("AB5") as a unit subject to the 2015 CCR Rule, pursued Brunner for alleged violations of the 2015 CCR Rule, or otherwise taken action to validate CBD's theory

1

of liability.  To the contrary, EPA has identified AB5 as a newly regulated unit under the 2024 CCR Rule, subject to prospective regulation only, which is completely at odds with CBD's theory of the case.

CBD's arguments against applying the diligent prosecution bar and deferring to the primary jurisdiction of the Pennsylvania Department of Environmental Protection ("DEP") also ring hollow because they require the second-guessing of DEP's specialized expertise and ongoing oversight of Brunner Island.

## ARGUMENT

### I.    CBD Cannot Satisfy Threshold Standing Requirements.

CBD has asserted injury on two grounds.  It alleges that its members have suffered (1) a recreational injury based on "contamination, including the elevated levels of arsenic migrating from Ash Basin 5" and (2) an informational injury based on Brunner's "failure to disclose required information."  Compl. ¶¶ 19–21.  In its response brief, CBD focuses its standing argument on an informational injury based on purported differences in reporting requirements between the CD and the 2015 CCR Rule.  But CBD has not alleged actual harm from a deprivation of information to which it is legally entitled; as a result, CBD has failed to establish that the informational injury is a cognizable injury-in-fact.

Moreover, CBD cannot meet the redressability requirement of Article III standing with respect to either alleged injury.  The Supreme Court has repeatedly

2

held that redressability is not satisfied when a plaintiff seeks injunctive relief that would not remedy the alleged injury. *See, e.g.*, *Steel Co. v. Citizens for Better Env't*, 523 U.S. 83, 108–10 (1988). CBD cannot satisfy this threshold requirement because its requested relief does not meaningfully differ from the ongoing obligations imposed by the CD, and any delta between the two would not actually redress CBD's complained-of harm.

## A.    CBD's Alleged Informational Injury Is Not a Cognizable Injury-in-Fact.

CBD's brief makes clear that its theory of standing largely hinges on its purported informational injury. *See* CBD Br. 15–16 (arguing the "most obvious difference between the Decree and the Rule relates to reporting requirements"). CBD points to a provision of the 2015 CCR Rule that requires owners and operators of regulated units to "maintain a publicly accessible Internet site." CBD Br. 15 (citing 40 C.F.R. § 257.107). However, CBD ignores the fact that Brunner materials related to the monitoring, assessment and abatement of AB5 (and the underlying groundwater) are publicly available. Specifically, the CD requires that Brunner provide this information to DEP who, in turn, publishes the information on its publicly accessible website.[1] CD ¶ 49. ("All approved work plans, final reports, and

---

[1] *Southcentral Community Information: Brunner Island*, Pa. Dep't of Env't Prot., https://www.pa.gov/agencies/dep/about-dep/regional-office-locations/southcentral-regional-office/southcentral-community-information/brunner-island.html    (listing

other deliverables (including all attachments), required by the Consent Decree and submitted by Brunner to the Department pursuant to this Consent Decree, will be posted by the Department on its website within a reasonable amount of time after receipt by the Department, for purposes of providing easily accessible information to the public regarding implementation of this Consent Decree.").

CBD has not shown how Brunner's transmittal of information to DEP for posting on DEP's website, rather than Brunner's posting of this information on its own website, has inflicted a "concrete" injury-in-fact. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). An assertion that information is in the wrong place is akin to an argument that CBD "received [information] *in the wrong format*," which does not amount to a cognizable injury. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 441 (2021) (emphasis in original).

Moreover, CBD has not identified any "downstream consequences" from failing to find information on Brunner's website. *Id.* at 442. In order to establish an informational injury, CBD must show "downstream consequences"—i.e., "purported harm *actually caused* by the specific violation" of informational access to which the plaintiff is legally entitled. *Pub. Int. Legal Found. v. Sec'y*

---

quarterly groundwater reports for AB5, among other information) (last visited June 30, 2025).

*Commonwealth of Pa.*, 136 F.4th 456, 464 (3d Cir. 2025) (quoting *Kelly v. RealPage*

*Inc.*, 47 F.4th 202, 213 (3d Cir. 2022)).  Even assuming a legal entitlement to reports

required for regulated units under the 2015 CCR Rule—which does not exist here

because, among other reasons, Brunner is not subject to that rule—CBD has failed

to show any actual harm caused by the information being located on DEP's website

rather than Brunner's.[2]

> **B.    CBD's Alleged Injuries Would Not Be Redressed by an Order Forcing Brunner to Comply with the 2015 CCR Rule Because Brunner's Ongoing Abatement and Monitoring Are at Least as Extensive as What the Rule Requires.**

The 2019 CD resolved actions brought by DEP and citizen groups similarly

situated to CBD.[3]  This Court entered the CD after DOJ and EPA reviewed its terms,

---

[2] These allegations likewise fall short of satisfying the redressability requirement, because CBD has not shown how putting this information on Brunner's website would allow its members "to make informed choices about their recreational activities" when the information is already available elsewhere.  Compl. ¶ 21.  Even if the 2015 CCR Rule and CD differ in some respects in terms of reporting requirements, CBD has not explained how those differences would affect its members' ability to make recreational decisions, or how its members are suffering an ongoing injury based on the current informational landscape.

[3] The citizens' Notice of Intent to Sue that led to the CD focused on, among other things, the alleged impact of AB5 on groundwater and sought abatement of the same. Likewise, DEP's complaint alleged, among other things, that AB5 was not operated to prevent and control water pollution and sought assessment and abatement actions, which were embodied in the 2019 CD.  Notably, citizen groups (including Environmental Integrity Project, or EIP) and CBD frequently collaborate on environmental matters, including lawsuits against EPA and other defendants.  *See, e.g.*, *Air Alliance Houston v. Trump*, 25-cv-01852 (D.D.C. filed June 12, 2025);

and Brunner's compliance with the CD remains enforceable by this Court.  CBD argues that the CD did not resolve claims under RCRA or equivalent state law, but the CD very clearly defines the "Applicable Environmental Laws" to include Pennsylvania's Solid Waste Management Act, which is analogous to the RCRA Subtitle D solid waste management program.  Moreover, the CD defines CCR by incorporating the federal definition in the 2015 CCR Rule, 40 C.F.R. § 257.53.  And in consideration of Brunner's undertakings in the CD, the citizens explicitly agreed to "release, waive and covenant not to sue Defendants for any and all claims, causes of action, and/or demands for injunctive relief, damages, legal fees, penalties or fines for alleged violations of Applicable Environmental Laws, the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972 et seq., the Coal Combustion Residuals Rule ("CCR Rule"), 40 C.F.R. Part 257 and permits issued thereunder."  CD General Provisions ¶ VI.6.

CBD complains that the 2015 CCR Rule "is more stringent and detailed" than the CD, yet the examples highlighted by CBD demonstrate that the CD is substantially equivalent to and in some ways more robust than what would have been

_Waterkeeper Alliance_, No. 23-636 (9th Cir. 2025); _Center for Biological Diversity v. Regan_, No. 22-cv-01855 (N.D. Cal. filed Mar. 24, 2022); _Center for Biological Diversity v. EPA_, No. 19-cv-02198 (D.D.C. filed July 24, 2019); _Wildearth Guardians v. EPA_, No. 11-cv-02064 (D.D.C. filed Nov. 17, 2011) (all of which included CBD and EIP, among others, as co-plaintiffs).

required for groundwater monitoring and corrective action under the 2015 CCR Rule.[4]    Indeed, Brunner's obligations under the CD have resulted in the implementation of a DEP-approved groundwater monitoring system and plan for abatement that meets or exceeds what would be required under the CCR Rule. Moreover, unlike the self-implementing, self-enforcing 2015 CCR Rule, the CD provides for daily stipulated penalties for failing to perform any obligation required by the terms of the CD, including any work plan or schedule approved by DEP thereunder.  CD ¶ 54.

Nonetheless, CBD takes issue with the groundwater monitoring program and points to the phased detection and assessment monitoring required by the CCR Rule, claiming that the CCR Rule's "specifications for installing wells, sampling groundwater, and analyzing results are far more detailed and demanding."  CBD Br. 13–14.  While CBD appears to primarily rely on a word count comparison to determine the adequacy of the programs, CBD Br. 14, it cannot seriously take issue with the sufficiency of the well network or monitoring program for AB5.  The CCR Rule establishes a default minimum of one upgradient and three downgradient

---

[4] Brunner does not argue, *contra* CBD Br. 9, that CBD's claims are barred on *res judicata* grounds.  Rather, the operation of the 2019 CD affects Brunner's ongoing monitoring, reporting, and abatement actions, which in turn affect CBD's theory of harm and redressability.

monitoring wells around each regulated unit. 40 C.F.R. § 257.91(c)(1). By contrast, AB5 has ***twenty-one*** wells, including seventeen that are located downgradient of the unit. CBD Br. Ex. 4. Even CBD concedes that Brunner has "placed monitoring wells around the perimeter of Ash Basin 5 to monitor the underlying groundwater." Compl. ¶ 36. In fact, it is Brunner's own monitoring that revealed the alleged contamination about which CBD complains, including "elevated levels" of lithium, aluminum, arsenic, molybdenum, and manganese." Compl. ¶¶ 36–37.[5]

However, the monitoring that would be required under the CCR Rule, which CBD claims is more "detailed and demanding," would not in the first instance even capture exceedances of those parameters. To the contrary, only three of these constituents (arsenic, lithium and molybdenum) are regulated under the CCR Rule and would only be subject to monitoring *if* Brunner first experienced statistically significant increases of different, Appendix III constituents. 40 C.F.R. §§ 257.94, 257.95. The other two constituents (aluminum and manganese) are not regulated under the CCR Rule and are subject to monitoring *only* under state law.

Likewise, CBD's criticism of the corrective measures being implemented for AB5 is misplaced and incorrect. The CCR Rule imposes progressive groundwater

---

[5] CBD's reference to the CD's requirement that Brunner visually inspect for seeps is at best a red herring, if not misleading. CBD Br. 14. That visual inspection is done *in addition to* the robust groundwater monitoring program.

monitoring and corrective action requirements that begin with semi-annual detection monitoring. 40 C.F.R. § 257.94. If there are statistically significant increases in Appendix III constituents, then the unit must transition from detection to assessment monitoring. 40 C.F.R. § 257.95. Thereafter, if there are statistically significant levels of Appendix IV constituents in comparison to established groundwater protection standards, and those levels cannot be attributed to an alternative source (including natural variability or another unit), then the unit must initiate an assessment of corrective measures. 40 C.F.R. § 257.96. Following this assessment and a public meeting to solicit input on the measures identified, a remedy must be selected and then implemented. 40 C.F.R. § 257.97. Importantly, while there are timeframes in the rule for many of these progressive steps, remedy selection is not time-bound. Rather, a remedy must be selected "as soon as feasible." *Id.* Even more importantly, remedy implementation is not subject to a regulatory deadline. Instead, a unit in corrective measures has the entire post-closure care period (up to thirty years) to achieve groundwater protection standards. 40 C.F.R. § 257.104.

Here, by contrast, pursuant to the terms of the CD, Brunner has already selected and started implementing a remedy, following review and approval by DEP. Both the remedy and DEP's approval are publicly accessible via DEP's website.[6] In

---

[6] *See supra* note 1 (navigate to "Ash Basin 5 Abatement Approval" document).

addition, under state law, Brunner is required to monitor groundwater on a ***quarterly*** basis rather than the CCR Rule's semi-annual requirement, and while the state list of monitoring constituents lacks three constituents regulated under the CCR Rule (cobalt, radium and thallium), 40 C.F.R. pt. 257 App'x IV, it adds ***sixteen*** constituents that are only regulated under state law (including copper, manganese, nickel, silver, strontium, titanium, vanadium and zinc).  Moreover, the approved abatement system captures all impacted groundwater, so any difference in the specific constituents monitored is of no consequence to the remedy.

Finally, and tellingly, CBD admits that "[t]he most obvious difference between the [CD] and the [CCR Rule] relates to reporting requirements," in that the CD does not require Brunner to post its groundwater sampling results on a public website.  CBD Br. 15.  As set forth above, that argument fails in that it seeks to put form over substance; the results are in fact posted to a publicly available website; as such, CBD cannot legitimately claim this purported lack of information as a cognizable injury.  And because the information is in fact publicly available, there is no meaningful distinction between the requirements of the CD and the CCR Rule and thus nothing for this Court to redress.

## II.    Brunner is Not in Violation of the 2015 CCR Rule.

Acknowledging that applying the 2024 rule's "liquids" definition to AB5 would amount to improper retroactive enforcement, CBD argues that its theory of

violation rises and falls with the 2015 rule alone.  CBD Br. 5–7.  But the 2015 rule on which CBD bases its claim cannot sustain its position.  The rule's plain text, structure, and purpose establish that AB5 is not an inactive CCR surface impoundment subject to regulation.

CBD is also incorrect that the 2015 rule should be interpreted in a vacuum.  In 2024, EPA identified AB5 as a CCR management unit subject to prospective regulation, and the 2024 rule itself makes it abundantly clear that AB5 cannot be both a CCR management unit and an inactive CCR surface impoundment.

A.    **AB5 is Not an Inactive Surface Impoundment Under the 2015 Rule.**

In CBD's historical retelling, AB5 was never actually "closed," based entirely on the presence of groundwater around the unit, and therefore, must be classified as an inactive surface impoundment under the 2015 rule.  CBD Br. 4–6.  CBD's position is belied by basic rules of statutory and regulatory interpretation.  *Arcos Sanchez v. Attorney General*, 997 F.3d 113, 119 (3d Cir. 2021) ("The basic tenets of statutory construction apply to construction of regulations.") (citation omitted).

EPA defined an "inactive" surface impoundment, subject to regulation under the 2015 rule, as a CCR surface impoundment that "no longer receives CCR" but "still contains both CCR and liquids" after the rule's effective date of October 19, 2015.  40 C.F.R. § 257.53.  EPA explained, "[b]y contrast, a 'closed' surface impoundment" is one that "no longer contain[s] water" but could "continue to

11

contain CCR (or other wastes), and would be capped or otherwise maintained." 80 Fed. Reg. 21302, 21343 (Apr. 17, 2015).  In response to comments expressing concerns that surface impoundments "properly closed decades ago under state solid waste programs" could be regulated under the rule, EPA rejected that interpretation, explaining: "Accordingly, the final rule does not impose any requirements on any CCR surface impoundments that have in fact 'closed' before the rule's effective date—i.e., those that no longer contain water and can no longer impound liquid."[7] *Id.* EPA made clear that the rule would not "require 'closed' surface impoundments to 'reclose.'" *Id.*

Deeming AB5 to be an inactive surface impoundment under the 2015 rule would be contrary to the purpose of the rule.  EPA's stated reason for regulating inactive surface impoundments was that their risks "do not differ significantly from the risks associated with active CCR surface impoundments."  *Id.* at 21342. Specifically, the "impounded water"—which is sluiced or mixed together with CCR—at active and inactive surface impoundments alike, creates downward

---

[7] CBD faults Brunner's Motion for only quoting the first half of this sentence from the rule's preamble.  CBD Br. 4.  But Brunner has never hidden the fact that the meaning of liquids is central to this dispute, and the Motion cited and extensively discussed the operative definition of "inactive CCR surface impoundment" in the 2015 CCR Rule and the new definition of "liquids" in the 2024 CCR Rule.  Mem. 6.

pressure, called hydraulic head, which can cause leaching of contaminants into neighboring groundwater. *Id.* at 21357–21358.

In distinguishing between "closed" surface impoundments that "no longer contain water" on the one hand, and active and inactive surface impoundments on the other, EPA explained that active and inactive surface impoundments "both can leak into groundwater" due to the large volumes of liquids and CCR that create hydraulic head. *Id.* at 21343. Thus, EPA intended the rule to mitigate the harms from "units that contain a large amount of CCR managed with water, under a hydraulic head that promotes the rapid leaching of contaminants." *Id.* at 21357.

In light of the rule's purpose, it would make little sense to redefine "water" in that context to mean groundwater, because the unit's impounded water is what creates downward pressure that risks leaching contaminants into nearby groundwater. Clearly, groundwater that flows into, through and out of a unit cannot be impounded; indeed, the lateral flow in and out is the exact opposite of impoundment.

CBD's interpretation also defies the structure and text of the rule. Under CBD's argument, EPA silently defined "still contains both CCR and liquids" to mean any surface impoundment that still contains CCR and intersects with groundwater. But if EPA in the 2015 rule wanted to define "liquids" to include "groundwater" as it later did in 2024 (or conversely wanted to define closed units as

13

those that no longer contain groundwater) it surely would have included such definitions. Not one of the hundreds of references to "groundwater" in the 2015 rule used the term interchangeably with the type of "water" or "liquids" contained in inactive surface impoundments. *See, e.g.*, *id.* at 21328 ("[I]n the case of surface impoundments, the CCR is *managed with water*, under a hydraulic head, which promotes rapid leaching of contaminants *into neighboring groundwater*.") (emphasis added). That is why the rule establishes groundwater monitoring requirements. The 2015 rule never referred to the presence of groundwater as a factor for differentiating regulated and exempt units. And the rule's requirements for inactive surface impoundments to close do not condition their closure on stopping the inflow or outflow of groundwater. *Id.* at 21492. Indeed, despite its claim that Brunner has been violating the CCR Rule since 2015, CBD did not file this lawsuit until after the promulgation of the 2024 liquids definition.[8]

Common sense dictates, as confirmed by the rule itself, that EPA wanted to address surface impoundment liquids whose hydraulic head was forcing contaminant migration into groundwater. EPA gave no indication in the 2015 rule that the liquids of concern to be removed included groundwater itself. EPA

---

[8] Although CBD now disclaims any reliance on the 2024 CCR Rule, CBD's Notice of Intent to Sue cited and relied on the 2024 CCR Rule in claiming that Brunner was in violation of the 2015 CCR Rule.

repeatedly and extensively discussed groundwater as being on the receiving end of contamination from surface impoundments—not as a liquid waste itself inflicting the contamination.  If EPA wanted to define liquids to include groundwater in the 2015 rule, it could have easily done so (as it did in 2024); instead, the rule uses the terms "liquids" and "groundwater," sometimes in close proximity, to mean different things.  *See Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 685, 698 (2022) (explaining that courts must not ascribe to one word a meaning so broad that it assumes the same meaning as another term in the statute or regulation because "differences in language like this convey differences in meaning") (citations omitted).

EPA claimed that its "final definition makes extremely clear the impoundments that are covered by the rule, so an owner or operator will be able to easily discern whether a particular unit is a CCR surface impoundment."  80 Fed. Reg. at 21357.  But, as CBD seems to admit, "whether groundwater is a liquid," CBD Br. 5, is not at all "clear" from the rule's definition of CCR surface impoundments.

Finally, the D.C. Circuit's decision in *Electric Energy* is not binding on this Court and was resolved solely on jurisdictional grounds.  *Elec. Energy v. Env't Prot. Agency*, 106 F.4th 31, 47 (D.C. Cir. 2024) (holding that court did not have jurisdiction to consider petitions for review).  "A dismissal for lack of jurisdiction is plainly not a determination of the merits of a claim."  *Korvettes, Inc. v. Brous*, 617

15

F.2d 1021, 1024 (3d Cir. 1980). The decision also did not address the argument that applying EPA's rule to units closed decades ago such as AB5 would violate the presumption against retroactivity and Brunner's right to fair notice of its regulatory obligations.

**B.     EPA's Prospective Regulation of AB5 as a CCR Management Unit Means that It Cannot Be an Inactive Surface Impoundment.**

CBD does not seriously respond to the fact that AB5 cannot be both an inactive surface impoundment and a CCR management unit, only suggesting, without explanation, that "[t]he two categories are not necessarily exclusive." CBD Br. 7. But the 2024 rule definitions make clear that the two categories are, in fact, mutually exclusive. The rule defines CCR management units to be "CCR units that closed prior to October 19, 2015" and, in turn, explains that "closed prior to October 19, 2015," means that the "surface impoundment completed closure of the unit in accordance with state law prior to October 19, 2015." 89 Fed. Reg. 38950, 39051 (May 8, 2024). AB5 squarely fits this definition, which is why EPA identified it as a CCR management unit for prospective regulation.

If there were any doubt, the definition of CCR management units also excludes any "regulated CCR unit." *Id.* The term "regulated CCR unit" includes "inactive CCR surface impoundment[s]" but "does not include CCR management units." *Id.* at 39101. Thus, CCR management units exclude inactive surface

16

impoundments and vice versa.  EPA has identified AB5 as a CCR management unit for prospective regulation, so AB5 cannot simultaneously be an inactive surface impoundment subject to retroactive enforcement.

## III.  CBD's Arguments Against the Diligent Prosecution Bar and DEP's Primary Jurisdiction Require Second-Guessing DEP's Enforcement and Expertise.

CBD's argument against applying the diligent prosecution bar and deferring to DEP's primary jurisdiction, CBD Br. 12–13, would substitute CBD's judgment for DEP's enforcement authority and specialized expertise.  For instance, CBD, in its own analysis of Brunner's monitoring reports, faults DEP for its alleged "inaction" in response to Brunner's March 2024 report that showed certain constituents in downgradient monitoring wells exceeded state regulatory criteria. CBD Br. 13.  But this ignores the fact, plainly revealed on the same public website from which CBD evidently obtained Brunner's monitoring report, that DEP has now reviewed and approved Brunner's abatement system to address impacted groundwater around AB5.[9]  Moreover, even if CBD's complaints about DEP were right, the diligent prosecution bar applies even when "the State may not be taking the precise action [plaintiff] wants it to or moving with the alacrity [plaintiff]

_____

[9] CBD's argument on this point is ironic given that the 2015 CCR Rule itself is self-implementing.  EPA does not, for example, receive groundwater monitoring reports or review and approve proposed abatement plans, as DEP does under the 2019 CD.

desires." *Grp. Against Smog & Pollution, Inc. v. Shenago Inc.*, 810 F.3d 116, 132 (3d Cir. 2016).

Lastly, this Court has the inherent authority to abstain from deciding this dispute in deference to DEP's primary jurisdiction. CBD's claim that there is a blanket prohibition on applying the doctrines of abstention and primary jurisdiction in the context of RCRA citizen suits is not correct. CBD Br. 17. *See Raritan Baykeeper v. NL Indus., Inc.*, 660 F.3d 686, 695 (3d Cir. 2011) ("Raritan Baykeeper asks us to go a step further and hold that primary jurisdiction and *Burford* abstention never apply to RCRA and CWA actions. Like our sister circuits, we decline to impose such a general rule."). Courts defer to agency authority and expertise where a state agency is already overseeing abatement or remediation efforts. *See, e.g.*, *Melton Props., LLC v. Ill. Cent. R.R. Co.*, 539 F. Supp. 3d 593, 610 (N.D. Miss. 2021) (abstaining on primary jurisdiction grounds from considering CWA and RCRA claims because "[t]here is room for significant disagreement as to the necessity or wisdom of any particular course of action" (citation omitted)); *United States v. Sunoco, Inc.*, 644 F. Supp. 2d 566, 579–80 (E.D. Pa. 2009).

DEP has played an active role in approving and overseeing AB5's permitting requirements, including requirements for groundwater monitoring, under the state residual waste program since the 1990s. The 2015 CCR Rule itself recognized the "critical" and "active" role that States play in overseeing CCR surface

impoundments.  80 Fed. Reg. at 21430.  Here, abstaining on the basis of DEP's primary jurisdiction is warranted in light of DEP's familiarity with and multi-decade history of regulating AB5, including DEP's oversight of Brunner's CD compliance obligations.

## CONCLUSION

For all the foregoing reasons, and those discussed in Brunner's opening brief, Brunner respectfully moves to dismiss CBD's complaint in its entirety.

*/s/ Bonnie A. Barnett*
Bonnie A. Barnett
FAEGRE DRINKER BIDDLE
    & REATH LLP
One Logan Square, Suite 2000
Philadelphia, Pennsylvania 19103
(215) 988-2916
bonnie.barnett@faegredrinker.com

Brooks M. Smith
    *Pro hac vice*
TROUTMAN PEPPER LOCKE LLP
1001 Haxall Point, Suite 1500
Richmond, VA 23219
(804) 697-1414
brooks.smith@troutman.com

Lindsey B. Mann
    *Pro hac vice*
TROUTMAN PEPPER LOCKE LLP
600 Peachtree Street, NE, Suite 3000
Atlanta, GA 30308
(404) 885-2743
lindsey.mann@troutman.com

19

*Counsel for Defendant Talen Energy*
*Corporation and Brunner Island, LLC*

## **Certificate of Compliance with Local Rule 7.8(b)**

Pursuant to Local Rule 7.8(b), I hereby certify that Brunner's Reply Brief in Support of its Motion to Dismiss the Complaint falls below the 5,000-word limit, totaling 4,370 words.

Dated: June 30, 2025                    /s/ *Bonnie A. Barnett*

## CERTIFICATE OF SERVICE

I hereby certify that on June 30, 2025, a copy of the foregoing DEFENDANTS' REPLY BRIEF IN SUPPORT OF THEIR MOTION TO DISMISS was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. Parties may access this filing through the Court's system.


Dated: June 30, 2025                      Respectfully submitted,


                                          */s/ Bonnie A. Barnett*
                                          Bonnie A. Barnett
                                          Brooks M. Smith (*pro hac vice*)
                                          Lindsey B. Mann (*pro hac vice*)

                                          *Counsel for Defendants*
                                          *Talen Energy Corporation and Brunner*
                                          *Island, LLC*